1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

LOUIS RANDOLPH
a.k.a. CLYDE LEWIS,

                   Plaintiff,

   v.

NEVADA DEPARTMENT OF
CORRECTIONS (NDOC), *et al.,*

                 Defendants.

3:17-cv-00085-MMD-CLB

**REPORT AND RECOMMENDATION
OF U.S. MAGISTRATE JUDGE**[1]

      This case involves a civil rights action filed by Plaintiff Louis Randolph, a.k.a., Clyde Lewis ("Plaintiff") against Defendants Brian Williams, James Stogner, Oswald "Justin" Reyes, Kristopher Ledingham, and Frank Dreesen (collectively referred to as "Defendants").[2]  Currently pending before the court is Defendants' motion for summary judgment (ECF No. 69).  Plaintiff responded (ECF No. 74), and no reply was filed.  Having thoroughly reviewed the record and papers, the court hereby recommends Defendants' motion for summary judgment (ECF No. 69) be granted.

**I.    BACKGROUND AND PROCEDURAL HISTORY**

      Plaintiff is an inmate in the custody of Nevada Department of Corrections ("NDOC") and is currently housed at the Southern Desert Correctional Center ("SDCC") in Indian Springs, Nevada.  (ECF Nos. 3, 6.)  Proceeding *pro se*, Plaintiff filed the instant civil rights action pursuant to 42 U.S.C. § 1983 alleging three counts against Defendants.  (ECF No. 6).  Plaintiff seeks monetary, injunctive, and declaratory relief.  (*Id.* at 19.)

---

[1]    This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4.

[2]    Plaintiff also named Correctional Officer Harris and Johnny Youngblood as defendants in his complaint (*See* ECF No. 6), but they were dismissed from this action pursuant to Fed.R.Civ.P. 4(m) as service was not effectuated.  (ECF No. 67.)

1    Pursuant to 28 U.S.C. § 1915(A)(a), the District Court entered a screening order

2    allowing Plaintiff to proceed on the following: (1) in Count I, a violation of the First

3    Amendment's guarantee of free exercise of religion against Defendants Reyes ("Justin"),

4    Dreesen, and Williams; (2) in Count I, a violation of the Religious Land Use and

5    Institutionalized Persons Act ("RLUIPA") against Defendants Reyes ("Justin"), Dreesen,

6    and Williams; (3) in Count I, a First Amendment retaliation claim against Defendant Reyes

7    ("Justin"); (4) in Count II, a violation of the First Amendment's guarantee of free exercise

8    of religion against Defendants Ledingham, Dreesen, and Williams; (5) in Count II, a

9    violation of RLUIPA against Defendants Ledingham, Dreesen, and Williams; (6) in Count

10   III, a violation of the First Amendment's guarantee of free exercise of religion against

11   Defendants Williams and Stogner; (7) in Count III, a violation of RLUIPA against

12   Defendants Williams and Stogner; and (8) in Count III, a violation of the Fourteenth

13   Amendment's guarantee of equal protection against Defendants Williams and Stogner.

14   (ECF No. 5 at 13-14.)

15       **A.    Facts Related to Count I**

16       In Count I, Plaintiff alleges the following: Plaintiff is Muslim.  (ECF No. 6 at 5.)  On

17   July 1, 2013, while housed at SDCC, Plaintiff was automatically removed from the religious

18   Jewish meal, which is kosher, and placed on the Common Fare Menu ("CFM").  (*Id.*)  From

19   roughly August 20, 2013, through July 8, 2015, there were constant problems with the

20   CFM meals.  (*Id.*)  Defendant Reyes continuously omitted two to three CFM items from

21   Plaintiff's breakfast, lunch, and dinner because Reyes failed to order or restock CFM items

22   for weeks or months, instead saving money by replacing the missing CFM items with food

23   from the general population meals, in violation of Plaintiff's religious beliefs.  (*Id.*)  Reyes

24   also refused to serve hot meals to non-Jewish CFM inmates, whenever there was a Jewish

25   fasting holiday, which last for two to eight days.  (*Id.*)  Plaintiff complained about the lack

26   of appropriate religious food to Reyes through kites and the grievance process.  (*Id.*)

27       When the Jewish Rabbi would occasionally come to SDCC to visit inmates, Plaintiff

28   would tell him about the problems Muslim inmates were having with CFM meals.  (*Id.*)  The

Rabbi would correct the situation temporarily, and Muslim inmates, including Plaintiff, would receive appropriate CFM meals.  (*Id.*)  However, Reyes would retaliate against Plaintiff and other CFM inmates for submitting grievances and reporting his violations to the Rabbi by serving them reduced portions, expired and undercooked food, and old vegetables and fruits, as well as by removing CFM items from their meals.  (*Id.* at 5-6.)  Further, Reyes would hire and then fail to properly train culinary workers, which resulted in inconsistent distribution of CFM food due to theft.  (*Id.* at 6.)  Plaintiff has lost twenty-eight pounds since being taken off the kosher diet and placed onto the CFM diet due to Reyes's failure to provide fully nutritious and adequate CFM meals.  (*Id.*)

On August 10, 2015, Plaintiff submitted Grievance #20063007241 regarding Reyes's failure to provide full CFM meals, rendering the meals nutritionally inadequate, which infringed on Plaintiff's free exercise of religion and violated RLUIPA.  (*Id.*)  Defendants Dreesen and Williams denied Plaintiff's grievance at the informal and first level, respectively.  (*Id.*)  On January 25, 2015, Plaintiff submitted his second level grievance, disagreeing with Williams's denial.  (*Id.*)  As of January 30, 2017, Plaintiff's grievance has not been answered and the CFM meal problems have not been remedied.  (*Id.*)

**B.    Facts Related to Count II**

In Count II, Plaintiff alleges the following: On July 18, 2015, religious observance of the Holy Month of Ramadhan was supposed to conclude with the Muslim evening meal, the Eid Feast.  (ECF No. 6 at 7.)  The Eid Feast is an integral part of Ramadhan.  (*Id.* at 8.)  At 2:29 p.m., while housed in SDCC Austere Housing ("AH"), Plaintiff asked non-party AH Correctional Officer Heaton if Muslims would be allowed to go to Chapel with the general population.  (*Id.* at 7.)  Heaton stated that, per AH operational procedures, they were sure Plaintiff could attend services, but to let them check with the Chaplain to confirm. (*Id.*)  Heaton called Chaplain Youngblood, then told Plaintiff that Muslims in AH would not be allowed to attend the Eid Feast in the Chapel, but that Defendant Williams and Youngblood had made arrangements with culinary staff to provide double portions to

Muslims in AH for their Eid Feast.  (*Id.*)

At 5:00 p.m., AH inmates were let out for dinner.  (*Id.*)  As Plaintiff stood in the chow line with the other Muslim inmates from AH, a single meal tray with double portions for the Eid Feast was handed out through the meal slot.  (*Id.*)  Defendant Harris, for no reason, stopped the service, then went to discuss the situation with her supervisor, Defendant Ledingham.  (*Id.*)  When Harris returned, she stated that Ledingham said Ramadhan was over and so no more double portions were to be served.  (*Id.*)  Plaintiff explained to Harris and Ledingham the arrangements made by Youngblood and Williams for AH Muslim inmates to finish Ramadhan with double portions for the Eid Feast.  (*Id.* at 8.)  Ledingham refused to listen to Plaintiff, instead saying that Ramadhan was over and threatening to write a notice of charges on Plaintiff if Plaintiff continued advocating.  (*Id.*)

Youngblood and Williams allegedly arranged the Eid Feast for AH Muslim inmates with the free culinary staff.  (*Id.*)  Plaintiff noted that the free culinary staff persons, at least one of whom is required to oversee inmate culinary workers at each meal, were all missing from that meal.  (*Id.*)

After being denied the Eid Feast by Harris and Ledingham, Plaintiff and nine other Muslim inmates did not eat the non-religious meal, instead returning to AH hungry and upset at being denied their religious observance.  (*Id.*)  Ledingham and Harris had no legitimate penological purpose in denying Muslim inmates, including Plaintiff, of their right to observe Ramadhan through the Eid Feast.  (*Id.* at 10.)

Plaintiff believes that Youngblood and Williams deliberately denied AH Muslims, including Plaintiff, their Eid Feast, and the opportunity to go to Chapel for Muslim service. (*Id.* at 9.)  According to NDOC Administrative Regulation ("AR") 518.02, inmates in AH are permitted to go to religious services.  (*Id.*)

On July 18, 2015, Plaintiff submitted an informal level grievance, #20063005214, regarding the denial of his right to observe Ramadhan through the Eid Feast.  (*Id.*) Dreesen denied Plaintiff's grievance.  (*Id.*)  On October 20, 2015, Plaintiff filed a first level grievance disagreeing with Dreesen's denial.  (*Id.*)  Around December 1st or 3rd, Williams

4

1   denied Plaintiff's first level grievance. (*Id.*)  On December 5, 2015, Plaintiff filed a second
2   level appeal disagreeing with Williams's denial. (*Id.*)  As of January 30, 2017, Plaintiff has
3   not received an answer or remedy for his grievance. (*Id.*)

4      **C. Facts Related to Count III**

5      In Count III, Plaintiff alleges the following: Chaplains Youngblood and Stogner, and
6   Warden Williams, all professed Christians, openly discriminate against Muslim inmates.
7   (ECF No. 6 at 11.)  The above Defendants accommodate Jewish religious beliefs, dietary
8   requirements (providing both Kosher and CFM meal options), fasts, and holiday
9   observances; and they allow a Rabbi to prevent tampering with their meals. (*Id.*)  At the
10   same time, similarly situated Muslim inmates, like Plaintiff, are denied the same
11   accommodation to practice the Islamic religions, through halal (lawful) meals allowing
12   them to observe dietary laws, fasts, holy days, and the presence of a Muslim butcher to
13   prepare meals in conformity with the holy days being observed. (*Id.*)  Defendants enforce
14   AR 810 and 814 in a discriminatory manner, denying Plaintiff and other Muslim inmates
15   equal treatment compared to Jewish and Christian inmates. (*Id.*)

16      Plaintiff's religion prescribes that Muslims must eat halal food, meat slaughtered by
17   a Muslim butcher in the name of Allah, and other prescribed food blessed for a Muslim's
18   consumption. (*Id.* at 11-12.)  The CFM provides for adherents of the Jewish religion but
19   leaves Plaintiff with no other option for his meals, forcing Plaintiff to eat food prepared
20   under Jewish law, rather than food prepared under Muslim law. (*Id.* at 12.)  Further, Jewish
21   inmates get meals prescribed for them by their religion on their prescribed holy days. (*Id.*)
22   On these days, Plaintiff is denied hot food despite his requests, and is also denied the
23   special food given to Jewish inmates on these days. (*Id.*)  Additionally, the current Jewish
24   CFM meals are not kosher, and are therefore not appropriate for Muslim consumption.
25   (*Id.*)  Food is also prepared for Muslim inmates by non-believing inmates because
26   Defendant Justin does not hire inmates who are on the CFM meal. (*Id.*)  CFM meals are
27   also often served cold, with reduced portions, missing items, old fruits and vegetables,
28   and Justin often uses CFM meals to punish Plaintiff for complaints to the Rabbi. (*Id.*)

1  Most Jewish inmates are white or Caucasian, whereas most Muslim inmates are

2  black. (*Id.* at 13.)

3  Plaintiff spoke with Youngblood on or around September 23 and 25, 2015, about

4  CFM meals infringing on Plaintiff's religious beliefs, and asking for halal meals. (*Id.*)

5  Youngblood told Plaintiff that Plaintiff was afforded CFM, and that Muslims can eat Jewish

6  food, so Plaintiff would not be afforded halal meals. (*Id.*)

7  On September 27, 2015, Plaintiff submitted an informal grievance # 20063008958

8  complaining of the inadequacy of the CFM meals, of being denied hot meals, and of being

9  forced to eat cold meals when Jewish inmates observed religious holidays. (*Id.*) Plaintiff

10  requested to be treated equally in his free exercise of religion. (*Id.*) On September 28,

11  2015, Plaintiff submitted to Youngblood a "Request for Accommodation of Religious

12  Practice" for review by the Religious Review Team ("RRT"). (*Id.*) The RRT, consisting of

13  Youngblood, Williams, and an Assistant Deputy Director has 120 days to respond to the

14  accommodation request. (*Id.* at 14.)

15  On October 28, 2015, Youngblood denied Plaintiff's informal grievance. (*Id.*)

16  Plaintiff submitted his first level grievance around January 21 or 23, 2016, disagreeing with

17  Youngblood's denial, and Williams denied the grievance at the first level. (*Id.* at 13-14.)

18  On January 25, 2016, Plaintiff submitted his second level grievance, disagreeing with

19  Williams's denial. (*Id.* at 14.)

20  On May 16, 2016, Plaintiff wrote to Defendant Stogner of the RRT regarding his

21  accommodation request but has not received a response. (*Id.*) As of January 30, 2017,

22  Plaintiff had not received a response to his second level grievance or his accommodation

23  request. (*Id.*)

24  **D.   Defendants' Motion for Summary Judgment**

25  On November 13, 2019, Defendants filed a motion for summary judgment (ECF

26  No. 69.) Defendants assert they are entitled to summary judgment because (1) Plaintiff

27  failed to file his complaint as to Count I, within the applicable statute of limitations period,

28  (2) as to Count II, Plaintiff was allowed to exercise his religious beliefs and the restrictions

1   placed on Plaintiff were due to safety and security concerns, which did not place a
2   substantial burden on Plaintiff's exercise of his religious beliefs, (3) as to the Count III First
3   Amendment claim, the *Turner*[3] factors weigh in favor of Defendants, (4) as to the Count
4   III RLUIPA claim, Plaintiff has failed to establish that Defendants' actions of providing
5   Plaintiff with a Kosher CFM diet substantially burdens his religious exercise; (5) as to the
6   Count III equal protection claim, there is no evidence that Plaintiff, a Muslim inmate, is
7   being treated differently than Jewish inmates, and (6) Defendants are entitled to qualified
8   immunity.  (*Id.*)  Plaintiff opposed the motion (ECF No. 74), and Defendants did not reply.

9   **II.    LEGAL STANDARD**

10          Summary judgment allows the court to avoid unnecessary trials.  *Nw. Motorcycle*
11  *Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court properly
12  grants summary judgment when the record demonstrates that "there is no genuine issue
13  as to any material fact and the movant is entitled to judgment as a matter of law."  *Celotex*
14  *Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  "[T]he substantive law will identify which facts
15  are material.  Only disputes over facts that might affect the outcome of the suit under the
16  governing law will properly preclude the entry of summary judgment.  Factual disputes
17  that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby*, 477
18  U.S. 242, 248 (1986).  A dispute is "genuine" only where a reasonable jury could find for
19  the nonmoving party.  *Id.*  Conclusory statements, speculative opinions, pleading
20  allegations, or other assertions uncorroborated by facts are insufficient to establish a
21  genuine dispute.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007);
22  *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996).  At this stage, the
23  court's role is to verify that reasonable minds could differ when interpreting the record;
24  the court does not weigh the evidence or determine its truth.  *Schmidt v. Contra Costa*
25  *Cnty.*, 693 F.3d 1122, 1132 (9th Cir. 2012); *Nw. Motorcycle Ass'n*, 18 F.3d at 1472.

26          Summary judgment proceeds in burden-shifting steps.  A moving party who does

27

28  _____
    [3]      *Turner v. Safley*, 482 U.S. 78, 89 (1987).

not bear the burden of proof at trial "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element" to support its case.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Ultimately, the moving party must demonstrate, on the basis of authenticated evidence, that the record forecloses the possibility of a reasonable jury finding in favor of the nonmoving party as to disputed material facts.  *Celotex*, 477 U.S. at 323; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  The court views all evidence and any inferences arising therefrom in the light most favorable to the nonmoving party.  *Colwell v. Bannister*, 763 F.3d 1060, 1065 (9th Cir. 2014).

Where the moving party meets its burden, the burden shifts to the nonmoving party to "designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).  "This burden is not a light one," and requires the nonmoving party to "show more than the mere existence of a scintilla of evidence. . . .  In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor."  *Id.* (citations omitted).  The nonmoving party may defeat the summary judgment motion only by setting forth specific facts that illustrate a genuine dispute requiring a factfinder's resolution.  *Liberty Lobby*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324.  Although the nonmoving party need not produce authenticated evidence, Fed. R. Civ. P. 56(c), mere assertions, pleading allegations, and "metaphysical doubt as to the material facts" will not defeat a properly-supported and meritorious summary judgment motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

For purposes of opposing summary judgment, the contentions offered by a *pro se* litigant in motions and pleadings are admissible to the extent that the contents are based on personal knowledge and set forth facts that would be admissible into evidence and the litigant attested under penalty of perjury that they were true and correct.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

1    III.    **DISCUSSION**

2        A.    **Count I – Free Exercise, RLUIPA, and Retaliation Claim**

3        Defendants move for dismissal of Count I of the complaint on the basis that

4    Plaintiff's claim is barred by the two-year statute of limitations applicable to claims brought

5    under 42 U.S.C. § 1983.  (ECF No. 69 at 4-5.)

6        Since 42 U.S.C. § 1983 contains no statute of limitations, federal courts apply the

7    forum state's statute of limitations for personal injury claims to determine whether a

8    complaint is timely filed.  *Johnson v. State of California*, 207 F.3d 650, 653 (9th Cir. 2000).

9    Therefore, in Nevada, the statute of limitations for § 1983 actions is two years.  *See* Nev.

10    Rev. Stat. § 11.190(4)(e); *Perez v. Seevers*, 869 F.2d 425, 426 (9th Cir. 1989), *cert.*

11    *denied*, 493 U.S. 860 (1989).  Under the applicable statute of limitations, Plaintiff had two

12    years from the time of the alleged injury to commence the instance suit.  *Id.*  An action is

13    deemed to be commenced when the complaint is filed.  *Id.*

14        "'Although state law determines the length of the limitations period, federal law

15    determines when a civil rights claim accrues.'"  *Knox v. Davis*, 260 F.3d 1009, 1012 (9th

16    Cir. 2001) (quoting *Morales v. City of Los Angeles*, 214 F.3d 1151, 1153-54 (9th Cir.

17    2000)).  Under federal law, "a claim accrues when the plaintiff knows or has reason to

18    know of the injury which is the basis of the action."  *TwoRivers v. Lewis*, 174 F.3d 987,

19    992 (9th Cir. 1999).  However, because the PLRA, 42 U.S.C. § 1997(e)(a), requires

20    inmates in Nevada to exhaust their claims through the NDOC's grievance process prior to

21    filing suit in federal court, the statute is tolled during the pendency of the grievance

22    process.  *See Brown v. Valoff*, 422 F.3d 926, 943-43 (9th Cir. 2005); *Wisenbaker v.*

23    *Farwell*, 341 F. Supp. 2d 1160, 1165 (D. Nev. 2004).  As such, events underlying a § 1983

24    action must fall within two years of the filing date, plus the number of days between the

25    filing of a grievance and prison officials' final response.

26        In his complaint, Plaintiff alleges that Defendant Reyes ("Justin") was omitting items

27    from his CFM tray from August 20, 2013 through July 8, 2015.  (*See* ECF No. 6 at 4-6.)

28    Defendants argue Plaintiff knew or should have known that his constitutional rights were

1    allegedly being violated as of August 20, 2013 and thus he was required to file his lawsuit

2    on or before August 20, 2015.  (ECF No. 69 at 4.)  Defendants further argue that while

3    Plaintiff may claim his constitutional rights were being violated on a continuing basis,

4    federal courts have held, "a mere continuing impact from past violations is not actionable."

5    (*Id.*) (citing *Knox*, 260 F.3d at 1013 (internal quotations and citations omitted)).

6         In opposition, Plaintiff argues that he encountered ongoing problems with his CFM

7    diet from August 20, 2013 through July 8, 2015.  (ECF No. 74 at 6.)  Plaintiff argues that

8    he had two years plus the number of days before he received his final response to his

9    grievance to file his complaint.  (*Id.* at 6-7.)  Plaintiff filed his informal grievance on August

10   10, 2015 and received his second level response on August 10, 2017.  (*Id.* at 45-46, 38.)

11   Plaintiff filed his complaint on February 6, 2017.  (ECF No. 1-1.)  Plaintiff does not present

12   any argument or evidence as to why he waited until almost two years after the initial injury

13   to file his informal grievance[4] and he does not present any evidence or argument that his

14   claim constitutes an ongoing violation such that there may be an exception to the standard

15   statute of limitations.

16        Based on the evidence before the court, Plaintiff knew or had reason to know of his

17   injury on or about August 20, 2013.  *See TwoRivers*, 174 F.3d at 992.  Thus, Plaintiff had

18   two years from August 20, 2013 to file his complaint.  While Plaintiff appears to argue that

19   equitable tolling should be applied to his claim, the court is not persuaded that equitable

20   tolling is appropriate.  Because Plaintiff has presented no evidence that he was diligently

21   pursuing his Count I claim against Defendants or that some unusual or extraordinary

22   circumstance prevented him from timely filing his compliant, equitable tolling is not

23   appropriate.  *See Wallace v. Kato*, 549 U.S. 384, 396 ("Equitable tolling is a rare remedy

24

25   [4]    While Defendants do not raise a failure to exhaust defense, it also appears Plaintiff
     may not have properly exhausted his administrative remedies as to his Count I allegations
26   as he (1) waited more than six months after his initial injury to file his informal grievance,
     and (2) filed his complaint before he completed the grievance process.  *See* NDOC,
27   Administrative Regulation 740: Inmate Grievance Procedure – Temporary 11/20/2018,
     http://doc.nv.gov/uploadedFiles/docnvgov/content/About/Administrative_Regulations/AR
28   %20740%20-%20Inmate%20Grievance%20Procedure%20-%20Temporary%20-
     %2011.20.2018.pdf (last visited May 26, 2020).

1   to be applied in unusual circumstances, not a cure-all for an entirely common state of

2   affairs."); *see also Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999) (Equitable tolling

3   is warranted "when extraordinary circumstances beyond the plaintiff's control made it

4   impossible to file a claim on time").  Therefore, based on the applicable two-year statute

5   of limitations, Plaintiff's alleged injuries as to Count I are time-barred.   Accordingly,

6   Defendants' motion for summary judgment  as to Count I should be granted.

7              **B.     Count III – First and Fourteenth Amendments and RLUIPA[5]**

8              Plaintiff's Count III claim relates to his contention that Defendants Harris,

9   Ledingham, Dreesen, and Williams denied Plaintiff his right to freely exercise his religion

10   in violation of the First Amendment and RLUIPA and violated the Equal Protection Clause

11   of the Fourteenth Amendment by not affording Muslim inmates the same religious dietary

12   accommodations as Jewish inmates, specifically failing to provide Muslim inmates kosher

13   or halal meat meals.  (ECF No. 6 at 7-8.)  Defendants move for summary judgment as to

14   Count III based on their contention that NDOC officials provided Muslims and Jewish

15   inmates the same diet options through CFM, and this did not place a substantial burden

16   on Plaintiff's exercise of his religious beliefs.  (ECF No. 69 at 6-9.)

17              **1.     First Amendment Free Exercise**

18              "The right to exercise religious practices and beliefs does not terminate at the

19   prison door.  The free exercise right, however, is necessarily limited by the fact of

20   incarceration, and may be curtailed in order to achieve legitimate correctional goals or to

21   maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per

22   curiam) (citations omitted); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348

23   (1987).  In order to implicate the Free Exercise Clause, the inmate's belief must be both

24   sincerely held and rooted in religious belief. *See Shakur v. Schriro*, 514 F.3d 878, 884-

25   85 (9th Cir. 2008).  "A person asserting a free exercise claim must show that the

26

27   _____

28   [5]       The court analyzes the Count III claim before the Count II claim based on its
significance.  Count III relates to Plaintiff's diet as a whole, while Count II relates to an
isolated incident regarding his diet.

government action in question substantially burdens the person's practice of [his] religion."  *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015).  A regulation that impinges on First Amendment rights "is valid if it is reasonably related to legitimate penological interests."  *Turner*, 482 U.S. at 89.

The factors *Turner* cited as relevant to the inquiry of whether the restrictions are reasonably related to legitimate penological interests are: (1) a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2)" whether there are alternative means of exercising the right that remain open to inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives" and the "existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91.

The Defendants do not appear to question Plaintiff's sincerely held religious beliefs or that those beliefs require him to consume a Kosher or Halal diet.  Defendants assert that Plaintiff currently receives a Kosher meal through the Common Fare meal plan.[6] (*See* ECF Nos. 69 at 7; 69-7.)  The issue, instead, is whether the Defendants' failure to provide a Halal meat diet interferes with Plaintiff's ability to freely exercise his religious beliefs.  To make this determination, the court must engage in an analysis under *Turner* of the reasonableness of the restrictions in light of the concerns posited by the Defendants.

As to the first *Turner* factor, Defendants assert the dietary policies are related to two legitimate penological interests, reduction of administration and budgetary concerns. (ECF No. 69-5.)  In support of this assertion, Defendants cite to AR 814.02(2), which discusses the Common Fare Policy.  (*Id.* at 2-3.)  According to this regulation, the Common Fare menu intends to: "A. Promote institutional safety, security, discipline, and

---

[6]    As support, Defendants provide a letter dated February 13, 2012, which discusses Plaintiff's request to continue receiving a kosher meal, (ECF No. 69-6), and a subsequent letter dated June 26, 2013, which states the current kosher menu is being converted to the Common Fare menu.  (ECF No. 69-7.)

order, consistent with consideration of cost and limited resources[; and] B. Promote the efficient planning, ordering, preparation, and delivery of religious/spiritual dietary meals to inmates, conserving fiscal resources and preventing waste." (*Id.*) The court finds there is a valid, rational connection between NDOC's dietary policy and its legitimate administrative and budgetary concerns and therefore, the first *Turner* factor weighs in Defendants' favor. *See Shakur*, 514 F.3d at 886 ("Although the marginal cost and administrative burden of adding [Plaintiff] to the roster of kosher-diet inmates would be small or even negligible, we cannot conclude that no rational nexus exists between [the prison's] dietary policies and its legitimate administrative and budgetary concerns. [The prison] could rationally conclude that denying Muslim prisoners kosher meals would simplify its food service and reduce expenditures.").

Second, the court must consider whether plaintiff has "alternative means by which he can practice his religion" or is "denied all means of religious expression." *Shakur*, 514 F.3d at 886. The relevant inquiry is not whether the inmate has an alternative means to engage in the particular religious practice that he claims is being restricted; rather, the inquiry is whether the inmate has been denied all means of religious expression. *O'Lone*, 482 U.S. at 351-52. Further, where "other avenues" remain available for plaintiff to exercise his religious rights, courts should be particularly conscious of the deference owed to prison administrators. *Turner*, 482 U.S. at 90.

Plaintiff concedes that he is permitted to conduct Qur'an readings, possess a prayer rug, and pray five times daily within his cell, but he asserts he is unable to fully participate in Ramadan, which requires worship with other Muslims and he is unable to participate in the Eid al-Fitr prayer service and Eid Feast. (ECF No. 74 at 12.) The court finds that NDOC provides Plaintiff with alternative means by which he can practice his religion, as he has the opportunity to participate in significant aspects of his religion and is not being denied all means of religious expression. *See O'Lone*, 482 U.S. at 351-52; *Williams v. Morton*, 343 F.3d 212, 219 (3rd Cir. 2003) (finding the second *Turner* factor is satisfied if the prison allows daily prayer, attendance at special weekly services and

13

observance of religious holidays, even if inmates could eat vegetarian meals but not Halal meat).  Thus, the second *Turner* factor weighs in Defendants' favor.

Under the third *Turner* factor, the court is required to consider the "impact accommodation … will have on guards and other inmates, and on the allocation of prison resources generally." *Washington v. Harper*, 494 U.S. 210, 225 (1990).  Defendants argue that Plaintiff's proposed accommodation, a Halal diet, could look like favoritism to other inmates and could lead to a hostile prison environment and would constitute a financial burden.  (ECF No. 69 at 8.)  Defendants provide no evidence to support this assertion.  Thus, the court cannot say as a matter of law that the third *Turner* factor weighs in favor of Defendants.  However, the court finds that the accommodation could impact guards, other inmates, and the institution's resources as described by Defendants.  *See Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (when accommodating an inmate's demands "would cause a significant reallocation of the prison system's financial resources and would impair the ability of correctional officers to protect all who are inside a prison's walls," the court is "'particularly deferential' to prison administrators' regulatory judgments (quoting *Turner*, 482 U.S. at 90)).

Finally, as to the fourth *Turner* factor, the court considers whether the presence of ready alternatives undermines the reasonableness of the regulations.  *Turner* does not impose a "least-restrictive-alternatives test," but asks whether the inmate "has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Overton*, 539 U.S. at 136 (citing *Turner*, 482 U.S. at 90-91).  Here, Defendants argue that Plaintiff is already on a kosher diet and has a vegetarian diet available to him.  (ECF Nos. 69 at 9; 69-6, 69-7.)  Thus, because Plaintiff already receives a kosher diet, Defendants provide a regulatory alternative that fully accommodates his religious needs.

While Defendants do not fully address the third *Turner* factor, in balancing all of the *Turner* factors, the court finds that the NDOC's culinary policy regarding Halal meals and using Common Fare as an alternative is reasonably related to the prison's legitimate

penological interests.  *See Beard v. Banks*, 548 U.S. 521, 532-33 (2006) (assigning more weight to the first of the *Turner* factors in determining whether a policy is reasonable).  Thus, the court concludes that the regulation is reasonably related to a legitimate penological purpose and is valid under *Turner*.  Therefore, summary judgment should be granted as to the Count III First Amendment claim.

## 2.    RLUIPA

RLUIPA, provides in relevant part:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  Thus, RLUIPA mandates a stricter standard of review for prison regulations that burden the free exercise of religion than the reasonableness standard articulated in *Turner*.  *Greene v. Solano County Jail*, 513 F.3d 982, 986 (9th Cir. 2008) (citations omitted).

To establish a RLUIPA violation, Plaintiff must show that: (1) he participates in a religious exercise, and (2) the prison regulation substantially burdened that exercise. *Walker v. Beard*, 789 F.3d 1125, 1134 (9th Cir. 2015).  The burden then shifts to the state to show its regulation is the least restrictive means of furthering a compelling governmental interest.  *Id.*  The Ninth Circuit has set out four factors for the RLUIPA analysis: (1) what "exercise of religion" is at issue; (2) what "burden," if any, is imposed on that exercise of religion; (3) if there is a burden, whether it is "substantial;" and (4) if there is a "substantial burden," whether it is justified by a compelling governmental interest and is the least restrictive means of furthering that compelling interest.  *Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1033 (9th Cir. 2007), *aff'd en banc*, 535 F.3d 1058, 1068 (9th Cir. 2008).

Although RLUIPA does not define what constitutes a "substantial burden" on religious exercise, the burden must be more than a mere inconvenience.  *Navajo Nation*,

479 F.3d at 1033 (internal quotations and citations omitted).  The Ninth Circuit has stated that a substantial burden is one that is "'oppressive' to a 'significantly great' extent." "That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise."  *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004)).   The burden must prevent the plaintiff "from engaging in [religious] conduct or having a religious experience." *See Navajo Nation*, 479 F.3d at 1033 (internal citations omitted).  In addition, a substantial burden exists when the state, "denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur*, 514 F.3d at 888 (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981) (internal quotations omitted)).

Here, the court finds that there is no evidence to indicate that Defendants' refusal to provide Plaintiff with a Halal meat diet places a "substantial burden" on Plaintiff's religious exercise.  Plaintiff claims the kosher diet and CFM diet are not the same meal and being switched from the kosher meat diet to the CFM diet constitutes a substantial burden on his religious exercise.  (ECF No. 74 at 14.) While Plaintiff may have preferred the kosher diet that was available prior to the institution of the CFM, Plaintiff does not present any evidence or identify any specific facets of the CFM that runs afoul of halal restrictions.  Thus, he has not identified how the current meal provided to him violates his dietary restrictions.  Further, the CFM diet does appear to be kosher compliant.  (*See* ECF No. 69-7.)  Because the record demonstrates that Defendants provided at least once acceptable dietary option to Plaintiff, his contention that his religious exercise was burdened necessarily fails.  Plaintiff has failed to prove that Defendants' refusal to provide him with a Halal meat diet prevents him from "engaging in religious conduct or having a religious experience."   *Navajo Nation*, 535 F.3d at 1091.   Accordingly, the court recommends that summary judgment be granted in Defendants' favor on Plaintiff's Count III RLUIPA claims.

### 3.   Fourteenth Amendment Equal Protection

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur*, 514 F.3d at 891 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).   The preliminary inquiry in an equal protection claim is identifying the plaintiff's relevant class, which is "comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (internal quotation omitted).   Then, "a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003).   Because the claim requires proof of intentional discrimination, "[m]ere indifference" to the unequal effects of a particular class does not establish discriminatory intent. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).

Defendants move for summary judgment on the equal protection claim on the basis that the record lacks evidence that Plaintiff and Jewish inmates are treated differently, as all inmates at NDOC institutions are afforded the opportunity for the same meals, through the CFM diet.  (ECF Nos. 69 at 9, 69-5.)  In opposition, Plaintiff argues that Defendants offer Jewish inmates with two meal options, a kosher meat diet and the CFM diet, while Plaintiff and other Muslim inmates are only offered the CFM diet, which he describes as a "vegetarian" meal.  (ECF No. 74 at 15.)  Plaintiff further asserts that NDOC officials offer this kosher meat diet "in secrecy."  (*Id.*)

The court recommends that Defendants' motion as to the Count III equal protection claim be granted.  First, there is an absence of evidence related to discriminatory intent, and Plaintiff's opposition fails to identify any evidence in the record from which a jury could conclude that Defendants intentionally discriminated against him on the basis of his Muslim beliefs.  Although Plaintiff broadly complains of differential treatment between Muslims and those of the Jewish faith, Ninth Circuit precedent provides that such differences—and mere indifference thereto—is not constitutionally infirm. *Hartmann v.*

1    *Cal. Dep't of Corrs. and Rehab.*, 707 F.3d 1114, 1123 (9th Cir. 2013) (within the prison

2    context, the Constitution's equal protection guarantees do not entitle each religious group

3    within a prison to "identical treatment and resources."); *Thornton*, 425 F.3d at 1167.

4    Without more, no constitutional claim can prevail.  Second, for the reasons explained in

5    the analysis of the First Amendment and RLUIPA claims, it is readily apparent that

6    Defendants accommodated Plaintiff's religious beliefs and allowed him a reasonable

7    opportunity to exercise his faith.  Plaintiff's opposition does not provide any basis for

8    concluding otherwise.  Finally, there is no evidence that Plaintiff and Jewish inmates are

9    provided different diets.  Thus, summary judgment should be granted as to Plaintiff's

10   Count III equal protection claim.

11            **C.      Count II – First Amendment and RLUIPA**

12            Plaintiff's Count II claim relates to his contention that Defendants Harris,

13   Ledingham, Dreesen, and Williams denied Plaintiff his right to freely exercise his religion

14   in violation of the First Amendment and RLUIPA by refusing to allow him to personally

15   attend the chapel for Muslim services and the Eid Feast on July 18, 2015 because he

16   was in AH, despite AR 518.02 which states that AH inmates are permitted to attend

17   religious services.  (ECF No. 6 at 7-8.)  Further, Plaintiff alleges he was denied a double

18   portion of the Eid Feast that was set up for AH Muslim inmates as an alternative to the

19   Chapel service.  (*Id.*)  Defendants move for summary judgment as to Count II based on

20   their contention that NDOC's restrictions were due to safety and security concerns, which

21   did not place a substantial burden on Plaintiff's exercise of his religious beliefs.  (ECF No.

22   69 at 5-6.)

23            As noted in section III(B)(1) *supra*, inmates retain the First Amendment right to

24   freely exercise their religion, subject to reasonable restrictions.  *See McElyea*, 833 F.2d

25   at 197 (citations omitted); *see also O'Lone*, 482 U.S. at 348.  In order to implicate the

26   Free Exercise Clause, the inmate's belief must be both sincerely held and rooted in

27   religious belief.  *See Shakur*, 514 F.3d at 884-85.  "A person asserting a free exercise

28   claim must show that the government action in question substantially burdens the

1  person's practice of [his] religion." *Jones*, 791 F.3d at 1031.  A regulation that impinges

2  on First Amendment rights "is valid if it is reasonably related to legitimate penological

3  interests." *Turner*, 482 U.S. at 89.

4        The factors *Turner* cited as relevant to the inquiry of whether the restrictions are

5  reasonably related to legitimate penological interests are: (1) a "valid, rational connection

6  between the prison regulation and the legitimate governmental interest put forward to

7  justify it"; (2)" whether there are alternative means of exercising the right that remain open

8  to inmates"; (3) "the impact accommodation of the asserted constitutional right will have

9  on guards and other inmates, and on the allocation of prison resources generally"; and

10  (4) the "absence of ready alternatives" and the "existence of obvious, easy alternatives."

11  *Turner*, 482 U.S. at 89-91.

12        To establish a RLUIPA violation, Plaintiff must show that: (1) he participates in a

13  religious exercise, and (2) the prison regulation substantially burdened that exercise.

14  *Walker*, 789 F.3d at 1134.  The burden then shifts to the state to show its regulation is

15  the least restrictive means of furthering a compelling governmental interest.  *Id.*  The

16  Ninth Circuit has set out four factors for the RLUIPA analysis: (1) what "exercise of

17  religion" is at issue; (2) what "burden," if any, is imposed on that exercise of religion; (3)

18  if there is a burden, whether it is "substantial;" and (4) if there is a "substantial burden,"

19  whether it is justified by a compelling governmental interest and is the least restrictive

20  means of furthering that compelling interest.  *Navajo Nation*, 479 F.3d at 1033.

21        The Defendants do not appear to question Plaintiff's sincerely held religious beliefs

22  or that those beliefs require him to participate in the Eid Feast.  The issue, instead, is

23  whether Defendants' restriction on Plaintiff's attendance at the Eid Feast as well as the

24  denial of the double portion of the Eid Feast meal was reasonably related to legitimate

25  penological interests of safety and security cited by the Defendants.

26        In their motion, Defendants do not address the *Turner* factors, but instead argue

27  that because Plaintiff was housed in AH in Unit 8 at SDCC, attendance at religious

28  services may be restricted due to security concerns or other special needs and SDCC

1   inmates housed in Unit 8 are only allowed to practice their religious beliefs in their cells

2   due to safety and security concerns.  (ECF No. 69 at 6.)  To support these assertions,

3   Defendants cite to AR 518 and AR 810, which relate to Austere Housing and Religious

4   Faith Group Activities and Programs, respectively.  (*See* ECF Nos. 69-2, 69-3.)

5   Defendants also cite to the response to Plaintiff's informal grievance to support their

6   contention that at SDCC, inmates in Unit 8 are only allowed to practice their religious

7   beliefs in their cells due to safety and security concerns.  (*See* ECF No. 69-4 at 7.)

8        A review of AR 518.02(1) and 518.02(2)(B) shows that religious services may be

9   restricted by the Warden due to security concerns or other special needs.  (ECF No. 69-

10   2 at 3.)  Further, AR 810.01(1) states the religious needs of inmates will be met, taking

11   into consideration safety, security, available resources, and need.  (ECF No. 69-3 at 2.)

12   The response to informal grievance #20063005214 states:

13        Inmate Lewis, your grievance dated 7-18-15 has been reviewed. In your
14        alleged misconduct by staff. You indicated that Sergeant Ledingham
          directed his subordinate staff to deny you an Eid Feast meal.  Chaplain
15        Youngblood, Sgt. Ledingham and Officer Harris were contacted regarding
          this matter. You were not allowed to attend the 12pm Eid feast because you
16        were assigned to SDCC housing unit 8.  Unit 8 inmates are allowed to
17        practice religious activities in unit. No additional Eid events were scheduled
          after the noon meal approved by the Wardens.

18        Grievance denied.

19   (ECF No. 69-4 at 7.)

20        As to Plaintiff's allegation that he did not receive the double portion of the Eid

21   Feast, Defendants assert Plaintiff was provided the same meal as the other Islamic

22   inmates on that date.  (ECF No. 69 at 6.)  Defendants cite to the response to the first level

23   grievance to support this assertion.  (*See* ECF No. 69-4 at 4.)  The response to the first

24   level grievance states:

25        Inmate Lewis #48875, I am in receipt of your grievance as it relates to being
          denied to participate in the Eid Feast. Inmate Lewis all inmates received the
26        same meal. Therefore, the pertinent point is your inability to sit and eat in
          fellowship with other Islamic inmates and the possibility of receiving double
27        portions. Inmate Lewis your inability to participate within the setting that was
          granted was NULLIFIED by YOUR actions that caused your housing during
28

20

1

the time of the feast to be the segregated unit of Southern Desert
Correctional Center. Grievance DENIED.

2

(*Id.* at 4) (emphasis in original).

3

4

While Defendants do not state the specific safety and security concerns that

5

caused Plaintiff's inability to attend the Eid Feast or receive the double meal portion,

6

"maintain[ing] good order, security and discipline, consistent with consideration of costs

7

and limited resources," is a compelling government interest. *Shakur*, 514 F.3d at 889

8

(citing *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)).   Additionally, non-essential

9

elements of a religion may be withheld from inmates in a disciplinary segregation unity,

10

even though they are provided to inmates in the general population. *See Allen v. Toombs*

11

827 F.2d 563, 567 (9th Cir. 1987) (security considerations supported restriction that

12

prevented Native American inmates in the disciplinary segregation unit from participating

13

in Sweat Lodge Ceremony).  Further, as more fully discussed in section III(B)(1) *supra*,

14

the NDOC offered Plaintiff many alternatives means by which he can practice his religion.

15

Thus, the court finds that restricting Plaintiff's access to the Eid Feast due to his

16

placement in segregated housing was reasonably related to legitimate penological

interests and is valid under *Turner*.

17

The evidence is also undisputed that Plaintiff's claims related to Eid Feast is limited

18

to one meal.  In order to establish a claim under either the Free Exercise Clause or

19

RLUIPA, the plaintiff must show that the defendants "substantially burdened" the practice

20

of his religion. *Shakur*, 514 F.3d at 883-84 (Free Exercise claim requires proof of a

21

substantial burden); 42 U.S.C. § 2000cc–1(a) (RLUIPA requires proof of "substantial

22

burden).  It is well settled law in the Ninth Circuit that intrusions which are "relatively short-

23

term and sporadic" do not constitute a substantial burden of an inmate's free exercise of

24

their religion. *Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998); *see also Howard*

25

*v. Skolnik*, Case No. 09-15382, 2010 WL 1253458 at *1 (9th Cir. March 30, 2010)

26

(unpublished memorandum disposition) (affirming summary judgment on "First

27

Amendment claim concerning two alleged incidents where prison personnel interfered

28

1  with prisoner's fasting because there was no genuine issue as to whether a substantial

2  burden was placed on Howard's free exercise of religion"); *Smith v. Cruzen*, No. 14-CV-

3  04791 LHK (PR), 2017 WL 4865565, at *4 (N.D. Cal. Oct. 26, 2017), *aff'd,* 735 F. App'x

4  434 (9th Cir. 2018) (granting summary judgment because one missed prayer did not

5  amount to substantial burden on plaintiff's right to free exercise of religion).

6  Plaintiff asserts he did not receive one double portion meal during the Eid Feast in

7  2015. Even if this is true, this single incident of receiving an improper Eid Feast meal is

8  a short-term and sporadic intrusion into Plaintiff's religious practice and does not

9  constitute a substantial burden on Plaintiff's rights.

10  Accordingly, based on all of the above, the court recommends that Defendants'

11  motion for summary judgment as to Count II be granted.[7]

12  **IV.    CONCLUSION**

13  For good cause appearing and for the reasons stated above, the court recommends

14  that Defendants' motion for summary judgment (ECF No. 69) be granted.

15  The parties are advised:

16  1.     Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of

17  Practice, the parties may file specific written objections to this Report and

18  Recommendation within fourteen days of receipt. These objections should be entitled

19  "Objections to Magistrate Judge's Report and Recommendation" and should be

20  accompanied by points and authorities for consideration by the District Court.

21  2.     This Report and Recommendation is not an appealable order and any notice

22  of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District

23  Court's judgment.

24  ///

25  ///

26

27

28  _____

[7]     Because the court recommends that Defendants' motion for summary judgment be
granted in its entirety based on a finding that no constitutional violations occurred, it need
not address Defendants' argument regarding qualified immunity.

**V.    RECOMMENDATION**

**IT IS THEREFORE RECOMMENDED** that Defendants' motion for summary judgment (ECF No. 69) be **GRANTED**; and,

**IT IS FURTHER RECOMMENDED** that the Clerk **ENTER JUDGMENT** accordingly.

**DATED**: May 27, 2020.

_____
**UNITED STATES MAGISTRATE JUDGE**